# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KATERINA M. L.,                )
                               )
            Plaintiff,         )
                               )
     v.                        )        1:22CV932
                               )
MARTIN J. O'MALLEY,            )
Commissioner of Social         )
Security,                      )
                               )
            Defendant.[1]      )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Katerina M. L., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 6 (cited herein as "Tr. __")), Plaintiff has submitted a dispositive brief in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 12), and the Commissioner has moved for judgment (Docket Entry 15; see also Docket Entry 16 (Commissioner's Memorandum), Docket Entry 17

---

[1] On December 20, 2023, President Joseph R. Biden, Jr., appointed Martin J. O'Malley as Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should substitute for Kilolo Kijakazi as Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

(Plaintiff's Reply)). For the reasons that follow, the Court should remand this matter for further administrative proceedings.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 236-42), alleging a disability onset date of June 28, 2019 (see Tr. 236).[2] Upon denial of that application initially (Tr. 105-20, 141-49) and on reconsideration (Tr. 121-38, 150-58), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 159-60). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 52-75.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 29-51.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-19, 25-28, 230-35), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2024.

. . .

2. [Plaintiff] has not engaged in substantial gainful activity since June 28, 2019, the alleged onset date.

. . .

---

[2] Although Plaintiff's application for DIB lists June 2**7**, 2019, as the alleged onset date (see Tr. 236), later administrative materials (see Tr. 105, 122, 188, 199, 262, 266, 309, 321) and the ALJ's decision (see Tr. 32, 34, 46) reflect the onset date as June 2**8**, 2019.

2

3. [Plaintiff] has the following severe impairments: post-traumatic stress disorder, major depressive disorder, anxiety, schizophrenia, obesity, history of cervical disc bulge, multilevel lower thoracic and lumbar spondylosis, and chronic tremor of right upper extremity.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform medium work . . . with the following additional limitations: [Plaintiff] could lift and/or carry fifty (50) pounds occasionally and twenty-five (25) pounds frequently. [Plaintiff] could frequently, but not continuously[,] perform all postural activities. [Plaintiff] should avoid workplace hazards, including, but not limited to, ladders, ropes, scaffolds, unprotected heights, and machinery with dangerous parts. [Plaintiff] could frequently, but not continuously, use the bilateral upper extremities for reaching in all directions, including overhead. [Plaintiff] could only occasionally push, pull, and operate hand controls with the right upper extremity. [Plaintiff] could stay on task, sustaining attention and concentration for two (2) hours at a time, but no work requiring a production rate or demand pace, such as assembly line, conveyor belt, fast-paced, highly automated work environments. [Plaintiff] should avoid work environments involving crisis situations, complex decision-making, or constant changes in a routine setting. [Plaintiff] could frequently, but not continuously[,] interact with supervisors, occasionally interact with coworkers, and should have no public contact or interactions.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

3

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from June 28, 2019, through the date of this decision.

(Tr. 34-46 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Even given that limited review standard, the Court should remand this matter for further administrative proceedings.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

4

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

5

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a

_____

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[5] Step four

---

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an

then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B.  Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

---

equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)."  Hines, 453 F.3d at 562-63.

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

1) "the ALJ's RFC finding failed to account for the mental limitations she concluded were proven in the record" (Docket Entry 12 at 3 (block formatting, initial capitals, and underscoring omitted); see also Docket Entry 17 at 1-5);

2) "the ALJ failed to assess or develop the record regarding [Plaintiff]'s acceptable reasons for having limited medical treatment" (Docket Entry 12 at 10 (block formatting, initial capitals, and underscoring omitted); see also Docket Entry 17 at 5-8); and

3) "the ALJ's dispositive finding is based upon unresolved vocational conflicts and, under the ALJ's RFC, [Plaintiff] cannot perform the jobs upon which the ALJ's decision depends" (Docket Entry 12 at 16 (block formatting, initial capitals, and underscoring omitted); see also Docket Entry 17 at 8-12).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 16 at 5-24.)

## 1. **Mental RFC**

In Plaintiff's first issue on review, she maintains that "the ALJ's RFC finding failed to account for the mental limitations she concluded were proven in the record." (Docket Entry 12 at 3 (block formatting, initial capitals, and underscoring omitted); see also Docket Entry 17 at 1-5.) More specifically, Plaintiff argues that, despite the ALJ's finding "persuasive" the opinions of the state agency psychological consultants and consultative psychological

9

examiner Dr. Brandon Chuman that Plaintiff's mental impairments limited her to performing simple, routine, and repetitive tasks ("SRRTs") (id. at 4 (citing Tr. 43-44, 116, 135, 423)), "the ALJ's RFC failed to accommodate [Plaintiff]'s proven limitation to [SRRTs]" (id. at 5 (citing Tr. 39-40)). Plaintiff additionally faults the ALJ for failing to "ask[] the [VE] about the impact on work for an individual limited to [SRRTs] by their impairments." (Id. at 6 (citing Tr. 52-75).) According to Plaintiff, that error by the ALJ does not qualify as harmless, because "'unskilled work' and 'simple tasks' are not the same thing and they are not interchangeable terms." (Id. at 7.) Those contentions miss the mark.

The ALJ here did find "persuasive" both the opinions of the state agency psychological consultants that Plaintiff remained capable of SRRTs (see Tr. 116, 135) and of Dr. Chuman that Plaintiff's mental impairments limited her to "simple, repetitive tasks" (Tr. 423). (Tr. 43-44.) Consistent with those findings, the ALJ twice in her decision signaled the intention to include "unskilled work" involving "routine and repetitive tasks" in the RFC (Tr. 44-45); however, the RFC does not include either limitation (see Tr. 39-40).

Contrary to Plaintiff's contentions (see Docket Entry 12 at 6-9), the ALJ's error in that regard remains harmless, because the ALJ included a limitation to "unskilled work of a routine,

10

repetitive nature" in her dispositive hypothetical question to the VE, and the VE responded that an individual limited to such work could perform three occupations available in significant numbers in the national economy (see Tr. 70-71). The ALJ adopted that testimony by the VE and found, at step five of the SEP, that Plaintiff remained able to perform those same three occupations. (See Tr. 46.) Thus, remanding the case for the ALJ to include "unskilled work of a routine and repetitive nature" in the RFC would serve no purpose, as the VE already provided occupations responsive to that limitation. Plaintiff nevertheless challenges the harmlessness of the ALJ's error on two grounds, neither of which carry the day.

First, Plaintiff argues that "'unskilled work' and 'simple tasks' are not the same thing," because "unskilled work can require the performance of tasks that are more than simple, routine, or repetitive." (Docket Entry 12 at 7.) In that regard, Plaintiff points out that "the [unskilled] occupations the ALJ relied on in her decision . . . required the ability to understand and carry out instructions which were detailed or diagrammatic in nature." (Id. at 7-8 (citing Dictionary of Occupational Titles ("DOT"), No. 323.687-010 ("Cleaner, Hospital"), 1991 WL 672782 (G.P.O. 4th ed. rev. 1991), DOT, No. 319.677-014 ("Food-Service Worker, Hospital"), 1991 WL 672771, and DOT, No. 381.687-018 ("Cleaner, Industrial"), 1991 WL 673258).)

11

As an initial matter, the DOT rates only one of the three jobs cited by the VE and adopted by the ALJ at step five, the "Food-Service Worker, Hospital" job, at Reasoning Development Level 3 ("RDL 3"), which requires a worker to "[a]pply commonsense understanding to carry out instructions in written, oral, or diagrammatic form," DOT, No. 319.677-014, 1991 WL 672771. The DOT rates the two remaining jobs, "Cleaner, Hospital" and "Cleaner, Industrial," at RDL 2, which involves "carry[ing] out detailed but uninvolved written or oral instructions," DOT, No. 323.687-010, 1991 WL 672782; DOT, No. 381.687-018, 1991 WL 673258. The United States Court of Appeals for the Fourth Circuit has held that jobs rated at RDL 2 do not conflict with an RFC limitation to SRRTs, see Lawrence v. Saul, 941 F.3d 140, 143-44 (4th Cir. 2019), and, thus, Plaintiff would have remained able to perform the two RDL 2 jobs even if the ALJ had limited Plaintiff to SRRTs instead of unskilled work of a routine and repetitive nature. The VE testified that 278,000 of those jobs existed in the national economy (see Tr. 70-71), which certainly qualifies as a significant number, see Guiton v. Colvin, 546 Fed. Appx. 137, 142 (4th Cir. 2013) (recognizing that, in Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979), the court found 110 jobs in the plaintiff's state to constitute a significant number of jobs).

Moreover, as the Commissioner notes, "[t]he regulations define unskilled work as 'work which requires little or no judgment to do

12

*simple* duties that can be learned on the job in a short period of time.'" (Docket Entry 16 at 12 (quoting 20 C.F.R. § 404.1568(a)) (emphasis added by Commissioner).) The Commissioner additionally points out that "[t]he [SSA]'s rulings further explain that '[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember <u>simple</u> instructions.'" (<u>Id.</u> at 12-13 (quoting Social Security Ruling 85-15, <u>Titles II and XVI: Capability to Do Other Work – The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments</u>, 1985 WL 56857, at *4 (1985) ("SSR 85-15"), and Social Security Ruling 96-9p, <u>Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work</u>, 1996 WL 374185, at *9 (July 2, 1996) ("SSR 96-9p")) (emphasis added).) Thus, remanding for the ALJ to change the word "unskilled" to "simple" would prove futile, because unskilled work already encompasses simple tasks. <u>See</u> <u>Richter v. Commissioner of Social Security</u>, 379 F. App'x 959, 961-62 (11th Cir. 2010) (holding that "the ability to complete simple tasks is encompassed by [an] unskilled limitation" (citing 20 C.F.R. § 404.1568(a))); <u>Vuxta v. Commissioner of Soc. Sec.</u>, 194 F. App'x 874, 878 (11th Cir. 2006) ("A limitation to simple tasks required no additional treatment from the ALJ because '[u]nskilled work is work which needs little or no judgment to do simple duties

13

that can be learned on the job in a short period of time.' 20
C.F.R. § 404.1568(a). Therefore, a limitation to simple tasks is
already contained within the unskilled limitation, and is not a
limitation above and beyond that classification.").

Second, Plaintiff contends that "'unskilled work' is not a
mental limitation that reflects an individual's functional
abilities at all, but is instead a work classification which is
applied to occupations where no skills are developed." (Docket
Entry 12 at 8 (citing 20 C.F.R. § 404.1568, and Program Operations
Manual System ("POMS") DI 25001.001(74)).) In that regard,
Plaintiff notes that the "Appeals Council[] has unequivocally told
its adjudicators in training materials that 'unskilled work' is an
inappropriate limitation for inclusion in a functional assessment
such as an RFC[.]" (Id. (citing Docket Entry 12-1 at 33 (Appeals
Council Training 2016 - "Evaluating Mental Impairments").)

Plaintiff's reliance on the ALJ's alleged failure to comply
with an Appeals Council training guide misses the mark, as well-
explained by another district court addressing the very same
passage from the training guide:

> [The plaintiff] argues, however, that the ALJ's
> limitation to "unskilled work" was a vocational factor,
> as opposed to a mental limitation, and therefore, did not
> adequately account for the moderate limitations the ALJ
> assessed. In support of this argument, [the plaintiff]
> relies on a portion of an "Appeals Council Training
> Guide" from 2016, which states:

ADJUDICATION TIP:

> You may be tempted to state that the claimant
> is 'able to perform unskilled work' when
> articulating the [RFC], based on the reference
> to unskilled work in Social Security Ruling
> 85-15. However, "unskilled work" is not a
> mental ability. "Unskilled work" is a
> vocational description.

> . . . [H]owever, courts have routinely held that internal
> manuals "do[ ] not have the force of law." Moraes v.
> Comm'r Soc. Sec., 645 F. App'x 182, 186 (3d Cir. 2016);
> Chalusian v. Comm'r Soc. Sec., 481 F. App'x 788, 791 (3d
> Cir. 2012) ("Internal social security manuals lack the
> force of law and do not bind the [SSA]." (internal
> citations omitted)). . . . Although [the plaintiff] does
> not identify any cases that have addressed an "Appeals
> Council Training Guide," and th[e c]ourt has found none,
> courts in th[e Third] Circuit have repeatedly determined
> that a violation of the procedural guidance in the
> [SSA]'s Hearings, Appeals and Litigation Law Manual
> ("HALLEX") is not judicially enforceable. See Bordes v.
> Comm'r of Soc. Sec., 235 F. App'x 853, 859 (3d Cir.
> 2007). That principle undoubtedly applies with even more
> force to an "adjudication tip" provided in a training
> guide than it does to HALLEX, an official reference
> source for staff throughout the [SSA]. See HALLEX
> I-1-0-3.

Karlin v. Saul, No. CV 20-3113, 2021 WL 2036649, at *5 & n.4 (E.D.

Pa. May 21, 2021) (unpublished) (some internal citations omitted);

see also Christensen v. Harris Cty., 529 U.S. 576, 587 (2000)

(finding that agency interpretations contained in "policy

statements, agency manuals, and enforcement guidelines . . . lack

the force of law"); Schweiker v. Hansen, 450 U.S. 785, 789 (1981)

(holding that SSA's Claims Manual "has no legal force," and does

not bind the agency); Moore v. Apfel, 216 F.3d 864, 868 (9th Cir.

2000) (". . . HALLEX is strictly an internal guidance tool,

15

providing policy and other procedural guidelines to ALJs and other staff members. As such, it does not . . . carry the force and effect of law."); <u>Rogers v. Berryhill</u>, No. 5:17CV27, 2018 WL 1308952, at *4 (W.D.N.C. Mar. 13, 2018) (unpublished) (noting that "[t]he Fourth Circuit Court of Appeals ha[d] not addressed the issue" of HALLEX's enforceability, but that "the persuasive authority among the [d]istrict [c]ourts [in the Fourth Circuit] holds that HALLEX lacks force of law" (collecting cases)); <u>Melvin v. Astrue</u>, 602 F. Supp. 2d 694, 704 (E.D.N.C. 2009) ("As an internal guidance tool, HALLEX lacks the force of law.").

Put simply, Plaintiff has failed to show that the ALJ prejudicially erred by failing to include a limitation to SRRTs in the RFC and thus her first issue on review falls short.

## 2. <u>Subjective Symptom Reports</u>

Next, Plaintiff asserts that "the ALJ failed to assess or develop the record regarding [Plaintiff]'s acceptable reasons for having limited medical treatment." (Docket Entry 12 at 10 (block formatting, initial capitals, and underscoring omitted); <u>see also</u> Docket Entry 17 at 5-8.) In particular, Plaintiff notes that, under Social Security Ruling 16-3p, <u>Titles II and XVI: Evaluation of Symptoms in Disability Claims</u>, 2017 WL 5180304, at *9-10 (Oct. 25, 2017) ("SSR 16-3p"), "[w]hile treatment frequency and compliance are relevant to an ALJ's assessment of the case, an [ALJ] must consider potential reasons for limited treatment and

16

'explain how [she] considered the individual's reasons.'" (Id. (quoting SSR 16-3p, 2017 WL 5180304, at *10).) In Plaintiff's view, the ALJ here "repeatedly relied on a supposedly limited or conservative treatment history as reasons why [Plaintiff]'s impairments did not affect her functioning to the degree she alleged" (id. at 12 (citing Tr. 39, 42-43)), but failed to "mention[ Plaintiff]'s documented financial and insurance limitations in obtaining routine or specialized treatment" (id.). Plaintiff additionally challenges the ALJ's finding "that [Plaintiff] was able to 'perform a wide variety of daily activities independently'" (id. at 13 (quoting Tr. 43)) as "not a legally sufficient reason to dismiss the limiting effects of all of [Plaintiff]'s alleged disabling limitations" (id.). Plaintiff further faults the ALJ for finding "that [Plaintiff]'s [right hand] tremor could be accommodated by limitations in pushing/pulling and operating hand controls only, [and] that [Plaintiff] would be unlimited in her ability to handle or finger[.]" (Id. at 14-15 (referencing Tr. 39-40).)

a.  Failure to Seek Treatment

Plaintiff points out that, in this case, "the ALJ found that the absence of inpatient or residential mental health treatment meant [Plaintiff]'s mental and neurological impairments were not as limiting as she suggested" (id. at 12 (citing Tr. 39, 42)), as well as that her "right hand tremor . . . was not impacting her

17

functioning to the level she alleged because 'she had not sought treatment from a neurologist since January 2020'" (id. (quoting Tr. 42)), and because "the record contained 'no treatment for that condition'" (id. (quoting Tr. 43)), but "failed to investigate or assess any of the acceptable reasons [Plaintiff] had for not pursuing treatment" (id. at 10 (citing Tr. 34-47, 52-75); see also Docket Entry 17 at 5-8). According to Plaintiff, she "was without medical insurance for the entire period of her disability claim," and "was paying out of pocket to see a provider who was mostly providing medication management." (Docket Entry 12 at 11 (citing Tr. 416).) Additionally, Plaintiff points to her "sworn testimony [] that she had received her insurance card just one day before her hearing [before the ALJ]." (Id. (citing Tr. 63).)

The Fourth Circuit has held that "[a] claimant may not be penalized for failing to seek treatment she cannot afford," because "'[i]t flies in the face of the patent purposes of the . . . Act to deny benefits to someone . . . too poor to obtain medical treatment that may help h[er].'" Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986) (quoting Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984)). An administrative ruling further expounds on an ALJ's duties when a claimant alleges an inability to afford treatment as follows:

> . . . [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, . . . [the

18

ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. [The ALJ] will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints. [The ALJ] may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not . . . sought treatment in a manner consistent with his or her complaints. When [the ALJ] consider[s] the individual's treatment history, [the ALJ] may consider (but [is] not limited to) one or more of the following:

. . .

An individual may not be able to afford treatment and may not have access to free or low-cost medical services.

. . .

[An ALJ] will consider and address reasons for not pursuing treatment that are pertinent to an individual's case. [The ALJ] will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them. [The ALJ] will explain how [he or she] considered the individual's reasons in [the ALJ's] evaluation of the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *9-10 (emphasis added) (bullet omitted).

Here, Plaintiff testified that she did not have a primary care physician at the time of the hearing, because she had just received her husband's insurance card the day prior to the hearing (see Tr. 62-63), that her doctors had diagnosed vertigo and "needed to do more testing," but that she had lacked "insurance at the time" (Tr.

19

63), and that she no longer took topiramate because she needed "to see a primary [care physician] to have that [prescription] filled" (Tr. 65). Consistent with that testimony, Plaintiff's medical records 1) reflected only one visit with a nurse practitioner to address Plaintiff's <u>medical</u> problems during the relevant period in this case (<u>see</u> Tr. 408-11 (visit on Jan. 3, 2020, to Nurse Practitioner Angela Mearns)), 2) described Plaintiff's method of payment as "self-pay" at the Cabarrus Rowan Community Health Center (<u>see, e.g.</u>, Tr. 404, 408, 596 (all caps font omitted)), and 3) reflected her statements to providers that she had not obtained follow-up treatment for her cognitive problems and seizures due to lack of insurance (<u>see, e.g.</u>, Tr. 406, 426; <u>see also</u> Tr. 422 (containing recommendation of Dr. Chuman that Plaintiff rule out an organic cause of her seizures and memory loss)), and hoped to qualify for disability so that she could "get back on med[ication]s" (Tr. 596).

Here, the ALJ noted on <u>four</u> occasions in her decision the lack of treatment in the record of Plaintiff's impairments. At two different places in the decision, the ALJ observed that "the record contain[ed] no evidence that, since [Plaintiff's] alleged onset date, [she] required emergency or inpatient hospitalization, crisis intervention, or residential placement secondary to her mental health impairments." (Tr. 39, 42; <u>see also</u> Tr. 42 (noting that Plaintiff "ha[d] been treating her mental health impairments

20

conservatively through her primary care provider throughout the relevant period").)[7] Regarding her physical impairments, the ALJ remarked that Plaintiff "ha[d] no detailed medical evaluation concerning [her right hand tremor] and . . . had not sought treatment from a neurologist since January 2020" (Tr. 42), as well as that "the record contain[ed] no treatment for [Plaintiff's right hand tremor] either through her primary care provider or a neurologist since [Plaintiff]'s alleged onset date" (Tr. 43).

---

[7] Contrary to the ALJ's remark that Plaintiff "ha[d] been treating her mental health impairments conservatively through her primary care provider" (Tr. 42 (emphasis added)), the record reflects that Plaintiff sought mental health treatment with Dr. Venkata Ravi Chivukula, a psychiatrist, see https://www.linkedin.com/in/venkata-ravi-chivukula-md-mph-fapa-1516a76/, who did not treat Plaintiff's medical impairments (see Tr. 593-624, 636-58). Moreover, the record reflects that Dr. Chivukula prescribed the anti-depressants Zoloft and Trazodone, the benzodiazepine clonazepam (trade name Klonopin), and the anti-psycotics Risperdal and Abilify to treat Plaintiff's mental symptoms which included auditory and visual hallucinations (see Tr. 597, 610, 641, 649, 653, 657), which undermines the ALJ's description of such treatment as "conservative[]" (Tr. 42). See Shelley C. v. Commissioner of Soc. Sec. Admin., 61 F.4th 341, 363 (4th Cir. 2023) ("A growing number of district courts have held that in cases where claimants consume antidepressant, anticonvulsant, and/or antipsychotic drugs, consistently attend visits with mental health professions, and endure constant medication adjustment and management, their treatment is classified as anything but 'routine and conservative.'"); Drawn v. Berryhill, 728 F. App'x 637, 642 (9th Cir. 2018) ("[T]he ALJ improperly characterized [the plaintiff]'s treatment as 'limited and conservative' given that she was prescribed a number of psychiatric medications."); Powers v. Kijakazi, No. 2:20CV1399, 2021 WL 5154115, at *10 (D. Nev. Nov. 4, 2021) (unpublished) (holding that treatment with benzodiazepines, anti-depressants, and the anti-psychotic drug Risperdal "was not a conservative course of treatment, and the ALJ erred in concluding otherwise"); James N. v. Saul, No. ED CV 18-1199, 2019 WL 3500332, at *6 (C.D. Cal. July 31, 2019) (unpublished) (". . . [T]he [c]ourt concurs with other district courts that have found antipsychotic medications such as Risperidone do not qualify as routine or conservative treatment."); Judy T. v. Commissioner of Soc. Sec. Admin., No. 4:18CV28, 2019 WL 4383140, at *10 (W.D. Va. July 25, 2019) (unpublished) (remanding, in part, where "ALJ [] did not explain how . . . evidence [that the plaintiff had tried multiple different sedatives, antidepressants, and antipsychotic drugs including Risperdal] . . . factored into [the ALJ's] conclusion that [the plaintiff] only conservatively treated her mental impairments during the relevant period"), recommendation adopted, 2019 WL 4345375 (W.D. Va. Sept. 12, 2019) (unpublished).

The ALJ's repeated reliance on Plaintiff's lack of treatment runs afoul of Lovejoy and SSR 16-3p in two ways. First, the ALJ failed to even acknowledge in her decision Plaintiff's lack of insurance and/or inability to afford treatment during the relevant period (see Tr. 34-46). See Lovejoy, 790 F.2d at 1117 ("A claimant may not be penalized for failing to seek treatment she cannot afford."); see also SSR 16-3p, 2017 WL 5180304, at *9 ("[The ALJ] will not find an individual's symptoms inconsistent with the evidence in the record on th[e] basis [of lack of treatment] without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints."). Second, and relatedly, the ALJ's decision lacks any discussion of "whether the evidence of record supports any of [Plaintiff]'s statements [about her inability to afford treatment] at the time he or she made them," and an "expla[nation] how [the ALJ] considered [Plaintiff]'s reasons in [the ALJ's] evaluation of [Plaintiff]'s symptoms," SSR 16-3p, 2017 WL 5180304, at *10. (See Tr. 34-46.)

These errors prevent the Court from meaningfully reviewing the ALJ's evaluation of Plaintiff's subjective symptom reports. See Kathleen L. v. Kijakazi, No. CV 1:23-1391, 2023 WL 6619366, at *19 (D.S.C. Oct. 10, 2023) (unpublished) (remanding where "[the p]laintiff testified she had been unable to afford treatment on her own and the free clinic would not see her because she was involved in litigation over a car accident," but "[t]he ALJ's decision does

22

not reflect his consideration of [the p]laintiff's explanation");
Arthur M. v. Kijakazi, No. 1:22CV3488, 2023 WL 7116501, at *8
(D.S.C. Aug. 1, 2023) (unpublished) (where "notations within the
medical treatment records reflect[ed the plaintiff's] inability to
pay the out-of-pocket costs required for lumbar steroid injections
and his impending loss of medical insurance coverage" and, thus,
that his "failure to pursue ongoing medical treatment was related
to his financial condition, the ALJ was not permitted to reject
[the plaintiff's] allegations based on his failure to obtain
treatment without first considering those reasons" (citing SSR
16-3p, 2017 WL 5180304, at *9)), recommendation adopted, 2023 WL
7115179 (D.S.C. Oct. 27, 2023) (unpublished); Shelton v. Kijakazi,
No. 1:21CV216, 2022 WL 4459830, at *6 (W.D.N.C. Sept. 23, 2022)
(unpublished) ("As the ALJ did not address the [p]laintiff's
reasons for declining additional treatment when formulating the
[p]laintiff's RFC, the [c]ourt is left to speculate as to whether
the ALJ considered this information, and if it was considered, how
it was considered."); McFadden v. Kijakazi, No. CV 2:21-01951, 2022
WL 3161766, at *6 (D.S.C. July 19, 2022) (unpublished) ("[T]he ALJ
emphasized [the p]laintiff's failure to receive specialized
treatment . . ., [but] never mentioned [the p]laintiff's alleged
inability to afford specialized treatment. The ALJ did not address
[the p]laintiff's testimony that he was unable to afford his
medication at times. The ALJ also did not address [a physician]'s

23

note that [the p]laintiff needed a further work up from an orthopedist but was unable to afford it. Accordingly, the ALJ's decision did not consider whether [the p]laintiff's failure to obtain additional treatment was based upon his alleged inability to pay for it. Courts routinely find remand is warranted under these circumstances." (internal parenthetical citations omitted) (collecting cases)), recommendation adopted sub nom. Fredrick M. v. Kijakazi, 2022 WL 3160312 (D.S.C. Aug. 8, 2022) (unpublished); Perryman v. Kijakazi, No. 1:21CV305, 2022 WL 1462688, at *5 (M.D.N.C. May 9, 2022) (remanding where ALJ's "reject[ion of the p]laintiff's alleged inability to afford treatment without any 'expla[nation of] how [the ALJ] considered [the plaintiff]'s reasons in [the ALJ's] evaluation of [Plaintiff]'s symptoms' . . . preclude[d] meaningful review by this Court of the ALJ's determination" (quoting SSR 16-3p, 2017 WL 5180304, at *9-10), recommendation adopted, 2022 WL 17831970 (M.D.N.C. May 25, 2022) (unpublished) (Biggs, J.); Gadsden v. Colvin, No. 4:12CV2530, 2014 WL 368216, at *4 (D.S.C. Feb. 3, 2014) (unpublished) ("Because the ALJ's analysis of [the plaintiff]'s credibility both relies heavily on her limited medical treatment history and fails to address whether she could afford to pay for other medical treatment, remand is warranted.").

24

The Commissioner contends that the ALJ did not err by relying on Plaintiff's lack of treatment, because Plaintiff "proffered no evidence whatsoever showing that she attempted to secure free or low-cost medical services or that she had no access to such treatment." (Docket Entry 16 at 18 (citing Brande v. Kijakazi, No. 1:21CV48, 2022 WL 3646002, at *5 (M.D.N.C. Aug. 24, 2022) (unpublished) (Peake, M.J.), recommendation adopted, 2022 WL 4386711 (M.D.N.C. Sept. 22, 2022) (unpublished) (Biggs, J.), appeal dismissed, No. 22-2197, 2023 WL 3568169 (4th Cir. Jan. 30, 2023) (unpublished), and Cummings v. Colvin, No. 1:14CV520, 2016 WL 698081, at *7 (M.D.N.C. Feb. 19, 2016) (unpublished), recommendation adopted, slip op. (M.D.N.C. Mar. 15, 2016) (Beaty, Jr., J.)).) The factual circumstances of those decisions, however, differ significantly from the facts in the instant case.

In Brande, "the ALJ specifically asked if [the p]laintiff had looked into any free clinics[,] . . . [and the p]laintiff responded that he had not," as well as expressly pointed out that "[t]he minimal treatment the [plaintiff] sought [wa]s particularly notable, given the fact that he had been working during part of the period at issue and therefore had a source of some income." See Brande, 2022 WL 3646002, at *5-6. Similarly, in Cummings, the ALJ expressly acknowledged that Plaintiff had testified that she lacked the funds to see a doctor, but the ALJ specifically found Plaintiff's hearing testimony not credible. See Cummings, 2016 WL

25

698081, at *7.  Thus, unlike the ALJ here, the ALJs in <u>Brande</u> and <u>Cummings</u> <u>both</u> acknowledged the claimants' alleged inability to afford treatment <u>and</u> provided an explanation for why the ALJs did not find the claimants' alleged lack of funds sufficient bases to justify the minimal treatment.  <u>See</u> <u>Brande</u>, 2022 WL 3646002, at *5-6; <u>Cummings</u>, 2016 WL 698081, at *7.[8]

In light of the foregoing discussion, the ALJ prejudicially erred under <u>Lovejoy</u> and SSR 16-3p by relying on Plaintiff's lack of treatment to discount her subjective symptom reports without considering her inability to afford such treatment.

---

[8] Other cases finding no error by the ALJ in discounting a claimant's subjective symptom reports based on lack of treatment similarly reflect that the ALJ both acknowledged the affordability issue and explained how the ALJ considered that issue. <u>See, e.g.</u>, <u>Byers v. Berryhill</u>, No. 1:17CV103, 2018 WL 318466, at *9 (M.D.N.C. Jan. 5, 2018) (unpublished) (finding no error in ALJ's rejection of the plaintiff's alleged inability to afford treatment where ALJ specifically found that "there [wa]s no indication that [the plaintiff] ha[d] explored the availability of free or reduced cost medical services," that "it [wa]s incumbent on [the plaintiff] to explore such availability rather than simply concluding that he c[ould] not pay for any medical care," that "a hospital emergency room [could] not refuse care based on an individual's inability to pay for care," that, "if [the plaintiff] had the extreme pain and functional limitations to which he testified, . . . it would be reasonable to expect that he would seek treatment, at least on occasion, rather than simply enduring the purported extreme pain and functional limitations," and that "[the plaintiff] was not reticent to seek medical treatment when he had a seizure, which . . . undermine[d] the credibility of his testimony regarding his failure to seek medical treatment"), <u>recommendation adopted</u>, slip op. (M.D.N.C. Apr. 4, 2018) (Tilley, S.J.); <u>Hawley v. Colvin</u>, No. 5:12CV260, 2013 WL 6184954, at *8 (E.D.N.C. Nov. 25, 2013) (unpublished) (finding no error in ALJ's consideration of the plaintiff's lack of treatment for back pain, where "[the plaintiff] testified that he [went] to the free clinic twice a week for counseling and for medical treatment for hypertension and asthma, but not for his back pain," and ALJ found that the plaintiff "ha[d] continued to complain of back pain but [] ha[d] not sought ongoing medical treatment for this even though there [we]re sources of free medical care available in the community").

26

b. Daily Activities

Plaintiff additionally faults the ALJ for discounting Plaintiff's subjective symptom reporting because she remained able to "perform a wide variety of daily activities independently.'" (Docket Entry 12 at 13 (quoting Tr. 43); see also Docket Entry 17 at 7-8.) In Plaintiff's view, "[t]he activities the ALJ suggested were contrary to [Plaintiff]'s alleged limitations were not of the caliber to reasonably support an inference that [she] could perform competitive full-time work." (Docket Entry 12 at 14.) More specifically, Plaintiff contends that "[t]he ALJ's suggestion that self-care, preparing simple meals, or performing light housework, such as sweeping, [washing] dishes, dusting, and folding clothes, were a 'wide variety' of tasks which were inconsistent with [Plaintiff]'s alleged disability was unreasonable and unjust." (Id. (citing Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981), and Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997).)

Notably, Plaintiff does not challenge the ALJ's description of Plaintiff's daily activities as inaccurate or overstated (see id. at 13-14); rather, Plaintiff contends that her ability to engage in those daily activities did not demonstrate "that [she] could perform competitive full-time work" (id. at 14). As the Commissioner points out, however, "the ALJ appropriately considered [Plaintiff's] daily activities 'not as examples of the functions [Plaintiff] could perform for an entire day' but rather to evaluate

27

whether her reported symptoms were fully consistent with the record." (Docket Entry 16 at 20 (quoting Ladda v. Berryhill, 749 F. App'x 166, 173 n.4 (4th Cir. 2018)).) Moreover, as the ALJ discussed (see Tr. 43), Plaintiff's ability to engage in activities such as writing in her journal and coloring with her dominant, right hand undercuts her assertion that her right hand tremor qualified as disabling. Plaintiff has thus not shown error with respect to the ALJ's consideration of Plaintiff's daily activities.

c.   Right Hand Tremor

Plaintiff further argues that, "[b]ased on [the ALJ's] conclusion that [Plaintiff]'s tremor was not as limiting as she alleged, the ALJ made practically no accommodation of this impairment in her RFC finding." (Docket Entry 12 at 14.) In particular, Plaintiff notes that "[t]he ALJ, without providing any basis for these particular limitations, felt that [Plaintiff]'s tremor could be adequately accommodated by limitations in pushing/pulling and operating hand controls only, [and] that [Plaintiff] would be unlimited in her ability to handle or finger[.]" (Id. at 14-15 (referencing Tr. 39-40).) Plaintiff deems that "conclusion [] improperly based on the ALJ's lay perception of the medical evidence" (id.), noting that "consultative [physical] examiner Earl Epps, Jr., M.D., clearly indicated that [Plaintiff]'s tremor would cause difficulty with dexterity and grip strength" (id. (citing Tr. 431)). Plaintiff

28

further points out that "every occupation which the ALJ's decision depended upon requires an individual to be able to handle frequently, from one-third to two-thirds of an 8-hour workday[.]" (Id. at 15-16 (citing Tr. 46, and DOT, No. 319.677-014, 1991 WL 672771, DOT, No. 323.687-010, 1991 WL 673258, and DOT, No. 381.687-018, 1991 WL 673258).)

To begin, although Plaintiff contended that the ALJ "accommodated [Plaintiff's right hand tremor] by limitations in pushing/pulling and operating hand controls only" (id. at 14-15 (emphasis added)), the ALJ also limited Plaintiff to "frequently, but not continuously, us[ing] the bilateral upper extremities for reaching in all directions, including overhead" (Tr. 40 (emphasis added)), and noted that she did so "in consideration of [Plaintiff]'s . . . right hand tremor, as observed in objective examination findings" (Tr. 43).[9] Although not argued by Plaintiff (see Docket Entries 12, 17), the ALJ, however, did err by finding "persuasive" (Tr. 43) the opinions of the state agency medical consultants, who both limited Plaintiff to frequent handling and fingering (see Tr. 114, 132-33), but then neither including a limitation to frequent handling and fingering in the RFC (see Tr.

_____

[9] Although the ALJ stated her intention to limit Plaintiff to frequent reaching "with the right upper extremity" (Tr. 43 (emphasis added)), in the RFC, the ALJ limited reaching by the "bilateral upper extremities" (Tr. 40 (emphasis added)). That discrepancy does not result in prejudicial error, as the RFC reflects greater, i.e., bilateral, reaching limitations (see Tr. 40) than the ALJ's narrative explanation describing only right-sided limitation (see Tr. 43).

29

39-40), nor providing any explanation for why she did not adopt the consultants' handling/fingering limitations (see Tr. 40-45). See Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *7 (July 2, 1996) ("SSR 98-6p") ("If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted.").

That error by the ALJ remains harmless under the circumstances presented here. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). All three jobs cited by the VE (see Tr. 70-71) and adopted by the ALJ at step five of the SEP (see Tr. 45-46) involve frequent handling and occasional fingering, see DOT, No. 319.677-014, 1991 WL 672771, DOT, No. 323.687-010, 1991 WL 673258, and DOT, No. 381.687-018, 1991 WL 673258. Thus, remanding for the ALJ to include a limitation to frequent handling and fingering in the RFC would not change the result in the case.[10]

In sum, the ALJ prejudicially erred by relying on the lack of treatment in the record to discount Plaintiff's subjective symptom

---

[10] Plaintiff has not offered any argument that her right-hand tremor would have warranted an RFC restriction to less than frequent handling and fingering. (See Docket Entries 12, 17.)

reports without considering her inability to afford treatment in violation of <u>Lovejoy</u> and SSR 16-3p, warranting remand.

### 3. **Conflict Between DOT and VE's Testimony**

In Plaintiff's third and final assignment of error, she argues that "the ALJ's dispositive finding is based upon unresolved vocational conflicts and, under the ALJ's RFC, [Plaintiff] cannot perform the jobs upon which the ALJ's decision depends." (Docket Entry 12 at 16 (block formatting, initial capitals, and underscoring omitted); <u>see also</u> Docket Entry 17 at 8-12.) In particular, Plaintiff contends that 1) the hospital cleaner and hospital food service worker jobs conflict with the RFC's preclusion of crisis situations and limitation to no public contact or interactions (Docket Entry 12 at 17-18 (citing Tr. 39-40)), and 2) the industrial cleaner job conflicts with the RFC's preclusion of exposure to machinery with dangerous parts (<u>id.</u> at 19 (citing Tr. 39-40)). According to Plaintiff, "[a]t the very least, the record here established an affirmative and specific conflict between the [VE]'s testimony and the contents of the <u>DOT</u>" (<u>id.</u> (citing Social Security Ruling 00-4p, <u>Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions</u>, 2000 WL 1898704 (Dec. 4, 2000) ("SSR 00-4p"), and <u>Pearson v. Colvin</u>, 810 F.3d 204 (4th Cir. 2015))) and, thus,

31

Plaintiff contends that "the ALJ violated [SSR 00-4p] by failing to recognize or resolve th[o]se apparent conflicts" (id. at 20).

SSR 00-4p places an affirmative duty on an ALJ to elicit an explanation from the VE as to any "apparent unresolved conflict" between the VE's testimony and the DOT:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the [DOT]. When there is an apparent unresolved conflict between VE . . . evidence and the [DOT], the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the [ALJ's] duty to fully develop the record, the [ALJ] will inquire, on the record, as to whether or not there is such consistency.

SSR 00-4p, 2000 WL 1898704, at *2 (emphasis added). "[A]n ALJ has not fulfilled his affirmative duty merely because the [VE] responds 'yes' when asked if her testimony is consistent with the [DOT]," Pearson, 810 F.3d at 208 (internal quotation marks omitted); thus, "[t]he ALJ independently must identify . . . where the [VE's] testimony seems to, but does not necessarily, conflict with the [DOT]," id. at 209 (emphasis added); see also id. (rejecting the Commissioner's argument that an "apparent" conflict meant only an "obvious" one).

a.   Crisis Situations

Plaintiff contends that "an individual who should avoid crisis situations should probably not be employed within a hospital" (Docket Entry 12 at 17), but provides no further argument

32

elaborating on why performance of the hospital cleaner and/or hospital food service worker jobs would expose Plaintiff to crises (see id. at 17-18; see also Docket Entry 17 at 8-9). Plaintiff's failure to develop that argument precludes relief on that basis. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do."); see also Linda C. v. Berryhill, No. 5:17CV1401, 2018 WL 3062150, at *4 (C.D. Cal. June 19, 2018) (unpublished) ("[The p]laintiff argues that a hospital is a hectic work environment where doctors and nurses are in and out of patient rooms, possibly running around and dealing with crisis. While hospital work may be hectic for doctors and nurses, it does not follow that hospitals are an overall hectic work environment for the cleaning staff. The [DOT] description includes cleaning areas where no one is likely to be present during cleaning times, such as bathrooms, laboratories, and offices." (internal quotation marks, citation, and ellipses omitted)); Nace v. Colvin, No. EDCV 14-641, 2015 WL 2383833, at *9 (C.D. Cal. May 18, 2015) (unpublished) ("Plaintiff's personal opinion is not a reliable source of job information, and she cites no legal authority for her contention

33

that the [c]ourt should overlook the two designated sources of reliable job information in this case - the [DOT] and the VE's testimony - in favor of her own subjective beliefs.").

b.   No Public Contact or Interactions

With regard to the no public contact or interactions limitation in the RFC, Plaintiff provides the following argument:

> Neither the hospital cleaner nor the hospital food service worker could avoid all contact with the general public, as the ALJ's RFC and dispositive hypothetical indicated [Plaintiff] must. Hospitals are public places, providing medical care to the general public. A hospital cleaner's foremost task is cleaning patient rooms, baths, laboratories, offices, halls, and other areas. This means a hospital cleaner would inevitably have contact with patients, and likely other members of the public who visit the hospital. A hospital cleaner's duties are not limited to places where they are exposed only to their coworkers or supervisors, but includes cleaning of rooms, hallways, and other areas where the general public would be present. There was simply no way to ensure that a person in the occupation of hospital cleaner would not have any contact with the public. . . .

> Even more problematic was the occupation of hospital food services worker . . . . According to the DOT, this occupation involves significant serving of people. The first task listed for this job in the DOT were [sic] prepares and delivers food trays to hospital patients. There was never any explanation as to how [Plaintiff] could successfully perform work as a hospital food services worker and avoid all public interaction or public contact. Patients are not coworkers or supervisors, they are members of the public. Accordingly, this occupation, despite being offered by the [VE] in response to the dispositive hypothetical, was also insufficient for someone with the limitations the ALJ found were proven in the record.

(Docket Entry 12 at 17-18 (internal citations, quotation marks, and brackets omitted); see also Docket Entry 17 at 9.)

34

Plaintiff has not shown that an "apparent unresolved conflict," SSR 00-4p, 2000 WL 1898704, at *2, existed between the VE's testimony that an individual limited to no public contact or interactions could perform the job of hospital cleaner, and the DOT's description of the job's duties as involving "cleaning 'patient rooms, baths, laboratories, offices, halls, and other areas,'" (Docket Entry 12 at 17 (quoting DOT, No. 323.687-010, 1991 WL 672782)). As well-explained by another district court:

> [The p]laintiff argues that members of the public are constantly coming and going from hospitals, even at night, such that the cleaning staff must encounter them. While cleaners would *see* patients and visitors, the VE explained that cleaners would not need to *interact* with such people. That explanation is reasonable; common experience counsels that hospital patients and visitors rarely interact with the hospital's cleaning staff. . . .
>
> Plaintiff next contends that interactions with patients would occur regularly because the [DOT] description calls for cleaning patient rooms. The description, however, refers to certain cleaning tasks occurring 'after dismissal of patients,' which is again consistent with common experience of how hospitals operate. . . . Even if this job requires some cleaning tasks in patient rooms while patients are present, that still would not require any level of social interaction with the patients. Typically, patients staying at a hospital are resting and recovering in their rooms, not conversing with the cleaning staff.

Linda C., 2018 WL 3062150, at *3 ((internal quotation marks and citations omitted) (emphasis in original)).

Indeed, district courts across the country nearly unanimously agree that the hospital cleaner job does not conflict with an RFC

35

restriction precluding contact with the public. See Wilson v. Commissioner of Soc. Sec., No. CIV-18-896, 2019 WL 2372621, at *3 (W.D. Okla. June 5, 2019) (unpublished) ("When identifying [the p]laintiff's past relevant work as a hospital cleaner, the ALJ noted it was unskilled, and that '[u]nskilled work generally involves work with things rather than people.' . . . Under this definition, unskilled work does not require any interaction with the general public . . . ." (emphasis added) (some internal quotation marks omitted) (quoting SSR 85-15, 1985 WL 56857, at *4)); Reil v. Berryhill, No. 2:17CV33, 2017 WL 4618158, at *3 (D. Me. Oct. 16, 2017) (unpublished) ("[E]ven if [the p]laintiff's [RFC] were to exclude interaction with the public, at step five, the ALJ found representative occupations that do not require meaningful contact with the general public . . . . The occupations include cleaner/hospital . . ., for which [] the occupational definition does not include interaction with the public. Th[e c]ourt has held that a job definition that includes the designation 'People: 8 — Taking Instructions — Helping,' and does not otherwise mention public interaction will support a step 5 determination for a claimant capable of handling usual work situations not involving the public." (emphasis added) (footnote and internal quotation marks omitted)), recommendation adopted sub nom. Reil v. Soc. Sec. Admin. Comm'r, 2017 WL 4973194 (D. Me. Nov. 1, 2017) (unpublished); Suarez v. Berryhill, No. 5:16CV415, 2017 WL 3782785, at *10

36

(E.D.N.C. July 24, 2017) (unpublished) ("[T]here is no apparent conflict between the RFC as determined by the ALJ [precluding the plaintiff from interaction with the general public] and [the plaintiff]'s past relevant work as a [hospital] cleaner as performed in the national economy and as described in the [DOT]."), recommendation adopted, 2017 WL 3707404 (E.D.N.C. Aug. 28, 2017) (unpublished); Graves v. Colvin, No. 1:12CV643, 2015 WL 5167240, at *6 (M.D.N.C. Sept. 3, 2015) (unpublished) (Tilley, Jr., S.J.) ("[T]he description of tasks for the hospital cleaner job [in the DOT] does not include interaction with others.  Therefore, it is sufficient to satisfy the Commissioner's burden at step five."); Dorsey v. Colvin, No. 3:13CV2165, 2014 WL 4519973, at *7 (N.D. Tex. Sept. 12, 2014) (unpublished) ("Nothing in th[e hospital cleaner's DOT] description indicates that the job requires contact with the public. . . .  In fact, [] the job[] indicate[s] that the relationship[] to People function is Not Significant." (internal quotation marks and footnote omitted)); Forsythe v. Astrue, No. EDCV 10-403, 2011 WL 3516166, at *1 (C.D. Cal. Aug. 11, 2011) (unpublished) ("[A]s to the job of hospital cleaner, [the p]laintiff speculates that he would likely have contact with patients when he went into their rooms to clean them, which would be inconsistent with the ALJ's finding that [the p]laintiff was capable of little more than non-public tasks.  However, the [DOT] . . . provides that the cleaning performed by a hospital

37

cleaner occurs after dismissal of patients, i.e., after they have
vacated their rooms.  Further, the [DOT] lists the job as People:
8 – Taking Instructions – Helping N – Not Significant, meaning
people skills are not a significant part of the job.  Thus, it
appears clear that [the p]laintiff's limitations regarding working
with people in public would not preclude him from performing the
job of hospital cleaner." (internal quotation marks, citations, and
ellipses omitted)); but see Chavez v. Astrue, No. EDCV 11-125, 2011
WL 4764080, at *4 (C.D. Cal. Oct. 7, 2011) (unpublished) ("[T]he
hospital cleaner duties requiring cleaning various hospital areas
[] places [sic] [the p]laintiff in contact with the public.").

A different result obtains with respect to the hospital food
service worker job.  As the Commissioner concedes (see Docket Entry
16 at 23 n.4), an apparent, unresolved conflict exists between the
VE's testimony that an individual precluded from public contact
could perform the hospital food service worker job and the DOT's
description of that job's duties.  Those duties require a worker to
"deliver[] food trays to hospital patients" and "[s]erve[] trays to
patients," DOT, No. 319.677-014, 1991 WL 672771 (emphasis added).
In addition, the DOT rates the degree of interaction with
"[p]eople" as "[s]erving" and "[s]ignificant."  Id.  Although the
VE stated that he based his testimony concerning the "nature of
interaction between workers, coworkers, and supervisors" on his
"training, education, [and] experience" (Tr. 73), he did not

38

specifically address this apparent conflict between the RFC and the hospital food service worker job (see Tr. 68-74). Accordingly, the ALJ erred by relying upon that job to support his step five burden. (See Tr. 45-46.)[11]

c.  No Exposure to Hazards

Lastly, Plaintiff asserts that "the remaining occupation the ALJ relied on at step five, that of industrial cleaner, also does not comply with the RFC restriction[ to] . . . avoid hazards which included . . . machinery with dangerous parts." (Docket Entry 12 at 19 (internal citations omitted) (citing, inter alia, Tr. 39-40); see also Docket Entry 17 at 9-10.)[12] Plaintiff notes that "an industrial cleaner '[k]eeps working areas in production departments of industrial establishment in clean and orderly condition'" (Docket Entry 12 at 19 (quoting DOT, No. 381.687-018, 1991 WL 673258)), which "includes working around or operating industrial equipment and conveyors, as well as cleaning, dusting, oiling and

_____

[11] The DOT rates the hospital food service worker job at RDL 3, which requires a worker to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations," DOT, No. 319.677-014, 1991 WL 672771. "Courts in this circuit have consistently held that [RDL] 3 jobs conflict with a limitation to [SRRTs]." Smith v. Berryhill, No. 1:18CV225, 2019 WL 5783529, at *2 (M.D.N.C. Sept. 30, 2019) (unpublished) (Schroeder, C.J.) (adopting recommendation of magistrate judge). As discussed above, because the ALJ's limitation to "unskilled work of a routine, repetitive nature" (Tr. 71) equates to a limitation to SRRTs, the hospital food service worker job's RDL 3 rating presents an additional, unresolved conflict rendering that job inappropriate to fulfill the ALJ's step-five burden.

[12] Plaintiff does not argue that the industrial cleaner job would expose her to the other types of hazards precluded by the RFC, e.g., "ladders, ropes, scaffolds, [and] unprotected heights" (Tr. 40). (See Docket Entries 12, 17.)

39

greasing machines, pipes and conveyors[, and] bringing raw materials to machine tenders or operators" (id.). In Plaintiff's view, "[a]t the very least, the number of jobs available to her in this occupation should have been adjusted to address [her] inability to be around certain machinery, despite such a responsibility being crucial in an *industrial* cleaning position." (Id. (emphasis supplied by Plaintiff).)

Plaintiff's argument fails for the simple reason that the DOT reflects that the industrial cleaner job does not involve exposure to moving mechanical parts, see DOT, No. 381.687-018, 1991 WL 673258 (listing "Moving Mech. Parts" as "Not Present - Activity or condition does not exist"), meaning that the job does not require "[e]xposure to possible bodily injury from moving mechanical parts of equipment, tools, or machinery," Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, App'x D ("Environmental Conditions"), § 8 ("Moving Mechanical Parts") (U.S. Dep't of Labor 1993) ("SCO").

Consistent with the DOT and SCO, other district courts have found that the industrial cleaner occupation does not conflict with an RFC restriction involving dangerous or hazardous machinery. See, e.g., Fenstermaker v. Commissioner of Soc. Sec. Admin., No. 1:17CV1272, 2018 WL 2709849, at *18 (N.D. Ohio May 21, 2018) (unpublished) (rejecting the plaintiff's argument that industrial

40

cleaner job conflicted with RFC's preclusion of moving machinery because, "according to the [DOT] descriptions for the [industrial cleaner] job[] that the VE identified in response to the first hypothetical question, moving mechanical parts . . . are not present, i.e., they are not activities or conditions that exist for the identified job[]"), recommendation adopted, 2018 WL 2689728 (N.D. Ohio June 5, 2018) (unpublished); Davis v. Astrue, No. EDCV 11-2033, 2012 WL 5878226, at *1-2 (C.D. Cal. Nov. 20, 2012) (unpublished) ("[A]s for the limitation against working around unprotected machinery, the [DOT] describes the[ industrial cleaner] position[] as requiring no interaction with moving mechanical parts. Presumably, in the absence of any moving parts, there is nothing from which one would need protection. Thus, it is unlikely that the[ industrial cleaner] position[] involve[s] unprotected machinery." (internal quotation marks and brackets omitted)).

In sum, although the ALJ erred by relying on the hospital food service worker job at step five, that error qualifies as harmless, because the hospital cleaner and industrial cleaner jobs remained appropriate to support the ALJ's step-five burden, and the VE testified that 278,000 such jobs existed in the national economy (see Tr. 70-71), a number clearly significant under Fourth Circuit precedent, see Guiton, 546 Fed. Appx. at 142 (recognizing that, in Hicks, 600 F.2d at 1051 n.2, the court found 110 jobs in the plaintiff's state to constitute a significant number of jobs).

41

### III. CONCLUSION

Plaintiff has established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated, and that this matter be remanded under sentence four of 42 U.S.C. § 405(g) for further administrative proceedings, to include an express evaluation of Plaintiff's alleged inability to afford treatment in accordance with <u>Lovejoy</u> and SSR 16-3p as part of the ALJ's re-evaluation of Plaintiff's subjective symptom reports. Upon remand, the ALJ should also 1) identify and resolve any apparent conflicts between the VE's testimony and the <u>DOT</u>, including those involving the RDL and social interaction requirements of any jobs relied upon at step five of the SEP; 2) ensure that the RFC and dispositive hypothetical question to the VE contain the same limitations; 3) explain why the ALJ did not adopt any portions of medical opinions found persuasive consistent with SSR 96-8p; and 4) evaluate the persuasiveness of all medical opinions and prior administrative findings in the record.[13] As a result, the Commissioner's Motion for Judgment on the Pleadings (Docket Entry 15) should be denied.

> /s/ L. Patrick Auld
> **L. Patrick Auld**
> **United States Magistrate Judge**

January 10, 2024

---

[13] Although not argued by Plaintiff (<u>see</u> Docket Entries 12, 17), the ALJ failed to evaluate the persuasiveness of the opinions of consultative medical examiner Dr. Epps (<u>see</u> Tr. 42-44).